[No. 15728-4-II.   Division Two.   July 25, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. DONALD J. PEJSA, JR., *Appellant.*

140

*Brett A. Purtzer,* for appellant (appointed counsel for appeal).

*Patrick D. Sutherland, Prosecuting Attorney,* and *Rodney G. Franzen, Deputy,* for respondent.

MORGAN, C.J. — Donald J. Pejsa, Jr., appeals from various felony convictions. He raises issues concerning venue, the taping of incriminating statements, sufficiency of the evidence, and sentencing. We affirm.

At the times material to this case, Michael and Beth Bohannon were husband and wife. In 1990, however, they separated. In May, Beth began a liaison with Donald Pejsa. By August, Beth's relationship with Pejsa was at an end, and she had reconciled with Michael.

After Beth and Michael were back together, Pejsa began threatening Beth by saying he would tell Michael of their "activities" unless Beth continued to have sex with him. Beth capitulated to his threats.

In September, Beth learned she was pregnant. She told Pejsa that Michael was the father, but Pejsa believed himself to be the father.

In October, Pejsa began harassing both Beth and Michael. His harassment took the form of "[p]hone calls, showing up at the house, following us in cars . . . [n]otes left on cars, harassing [Michael] at work."[1] Pejsa was also arrested for violating a temporary no-contact order. Beth repeatedly told him that his harassment was putting her through "an incredible amount of stress and that I was afraid that with all the stress I was going through I would miscarry."[2]

On December 21, 1990, Beth and Michael obtained a permanent no-contact order against Pejsa. After obtaining this order, the Bohannons moved to a new apartment, without telling Pejsa. They kept their new address and telephone number unlisted.

On the morning of February 4, 1991, Michael discovered a note from Pejsa taped to the front door of their new apart-

---

[1]Report of Proceedings vol. 2 (Nov. 6, 1991), at 72, 95, 107, 392-95, 403-11, 418-20.

[2]Report of Proceedings vol. 4 (Nov. 8, 1991), at 380.

ment. The note said: "Beth, I know where you live, Mike works, your phone number and where you live. But you asked me to stay away and I have and will continue to do so until you tell me differently. Please write . . .. Don. P.S. were you crying late Friday or early Saturday morning[?]"[3]

Beth reported this contact to the police. Later that day, the police reached Pejsa by phone and asked him to come to the station. He never did.

That evening, Beth and Michael were in their apartment with their neighbor, Martha Harris. As Beth and Harris began walking out the front door, Pejsa pushed it open from the outside. Armed with a "fairly good sized hunting knife", he grabbed Harris and forced her and Beth back into the apartment. Once inside, he told Harris to sit down on the couch, and he refused to let her leave when she asked to go.

At some point, Pejsa grabbed Beth by the hair. According to Harris, Michael could not intercede because

[h]e would try to go for Beth to get her away from him and [Pejsa] would keep threatening Beth with the knife. He held it at her throat. He would take the blunt end of the knife and hit her on the top of the head with it. And then he said that he was going to do things to her like cut her guts out, cut off her head, things like that.[4]

Ultimately, Pejsa demanded that Beth drive him to Chehalis. According to Harris, Michael then said, "Well, if she goes, I go. She's not going alone."[5] Still according to Harris, Pejsa "took both of them out the door. I heard him say, 'You are going to drive me down to Centralia.' "[6]

---

[3]Report of Proceedings vol. 5 (Nov. 12, 1991), at 440.

[4]Report of Proceedings vol. 4 (Nov. 8, 1991), at 337.

[5]Report of Proceedings vol. 4 (Nov. 8, 1991), at 338.

[6]Report of Proceedings vol. 4 (Nov. 8, 1991), at 338. According to Michael, he wanted to go with them because "[Pejsa] still had a hold of Beth by the hair, basically like dragging her out the door . . .", Report of Proceedings vol. 2 (Nov. 6, 1994), at 129, and he "feared for the safety of [his] wife." Report of Proceedings vol. 4 (Nov. 8, 1991), at 311. According to Beth, "He . . . wanted me to take him. And my husband said that he wasn't going to — I wasn't going alone. And [Pejsa] said at that point, 'Then all of us are going, let's go.' " Report of Proceedings vol. 5 (Nov. 12, 1991), at 448-49.

With Pejsa giving directions, Michael began driving south on Interstate 5 to Chehalis. South of Chehalis, Pejsa told Michael to take the Highway 12 exit toward White Pass/Yakima.

At some point, Pejsa got into the back seat with Beth. There, he forced her to undress by hitting her, and by threatening her and Michael with the knife. Then, while Michael was driving east on Highway 12, Pejsa raped Beth.

Somewhere on Highway 12, Michael stopped so Beth could go to the bathroom. When Beth returned, Pejsa got out so she could get back in. As Beth entered the car, Michael drove away, leaving Pejsa standing on the side of the highway. Michael drove to a nearby house and called the police in that area, but they could not locate Pejsa.

When Michael and Beth returned home, they notified the local police of what had happened. They also moved to a new, undisclosed location.

After February 4, the local police informed William Lewis, a friend of Pejsa's, that Pejsa was wanted and at large. Shortly thereafter, Pejsa showed up at Lewis' home, claiming he had turned himself in and was out on bail. Pejsa stayed with Lewis for a few days, then left prior to February 22.

On February 22, a neighbor of the Bohannons helped Pejsa enter Michael's and Beth's apartment. Pejsa told the neighbor that he had locked himself out of the apartment, but the neighbor became suspicious when Pejsa did not turn on the apartment lights after entering. The neighbor saw a police officer/friend who happened to be in the area, and he advised that person that Pejsa was in the apartment.

The officer went to the apartment and knocked on the door. Pejsa did not respond. Suspecting Pejsa was inside, the officer called for reinforcements.

For the next 7 hours, Pejsa held the police at bay by threatening to shoot and kill anyone who came into the apartment. He talked with police negotiators over a "throw phone", and eventually the negotiators allowed his parents to speak with him over the throw phone. All these conversa-

tions were recorded, and Pejsa made various incriminating statements. The standoff ended peacefully when Pejsa surrendered and was placed under arrest.

On February 23, Lewis realized that one of his handguns was missing. Although he had allowed Pejsa to use the gun while Pejsa was with him, Lewis had never given Pejsa permission to take it.

After Pejsa was arrested, the State charged him with six crimes:

Count I: First degree burglary of the Bohannons' home, committed on February 4;

Count II: Unlawful imprisonment of Harris;

Count III: First degree kidnapping of Michael;

Count IV: First degree rape of Beth;

Count V: First degree burglary of the Bohannons' home, committed on February 22; and

Count VI: Second degree possession of stolen property (Lewis' gun).

Pejsa pleaded not guilty by reason of insanity, and a jury trial began on November 4, 1991. Primarily through the testimony of the Bohannons and Harris, the State presented the above-detailed evidence.

During the State's case, Pejsa moved to suppress the audiotape of the police negotiations. He argued that the tape contained "custodial" statements taken without the benefit of *Miranda* warnings, and in violation of RCW 9.73.030. The trial court denied the motion and admitted the audiotape.

After the State rested, Pejsa for the first time moved to dismiss the rape count due to improper venue. The court denied the motion.

The jury rejected Pejsa's insanity defense and convicted him on all counts. At sentencing, the trial court ruled that none of the counts involved the same criminal conduct. Consequently, it ruled that Pejsa's standard range was 146 to 194 months on the rape, and 51 to 68 months on the kidnap.

Based upon a finding of deliberate cruelty, the trial court imposed a 232-month exceptional sentence on the rape. It ordered that this sentence be consecutive to a 68-month

standard range sentence on the kidnap, but concurrent with all other convictions.

On appeal, we address the following questions. (1) Did Pejsa waive his objection to venue on the rape charge? (2) Did the trial court err in admitting the audiotape of the police negotiations? (3) Was there sufficient evidence to support the convictions for first degree kidnapping of Michael, second degree possession of stolen property, and first degree burglary on February 22? (4) Did the trial court properly calculate Pejsa's offender score? And (5) did the trial court properly impose an exceptional sentence on the rape conviction?

## I

### VENUE

Article 1, section 22 of the Washington State Constitution provides that "[i]n criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed . . .." *See also* CrR 5.1. Relying on *State v. Marino*, 100 Wn.2d 719, 727-28, 674 P.2d 171 (1984), Pejsa argues that proper venue is an element of the crime and that the State failed to present sufficient evidence to establish it. The State counters that venue is not an element of the crime and that Pejsa waived his venue challenge by failing to raise it in timely fashion.

■■ Venue is not an element of a crime, and *Marino*'s statements to the contrary were disapproved in *State v. Dent*, 123 Wn.2d 467, 869 P.2d 392 (1994). Rather, venue is a constitutional right that is waived if not asserted in timely fashion. *State v. McCorkell*, 63 Wn. App. 798, 822 P.2d 795, *review denied*, 119 Wn.2d 1004 (1992). Generally, the right must be asserted before jeopardy attaches, which is to say before the jury is sworn in a jury trial. *Dent*, 123 Wn.2d at 480 (quoting *McCorkell*, 63 Wn. App. at 801). Here as in *McCorkell*, Pejsa "waived his challenge to venue by waiting until the end of the State's case to present it." *McCorkell*, 63 Wn. App. at 801.

## II

### AUDIOTAPES

Pejsa next argues the trial court erred by admitting the audio tape of his conversations with police negotiators. He says the tape was inadmissible because it resulted from "custodial interrogation" undertaken without *Miranda* warnings, and because it was recorded in violation of RCW 9.73.030.

## A

### *Miranda*

After a CrR 3.5 hearing, the trial court orally found that Pejsa was not "in custody" for purposes of *Miranda*, and that the police negotiators' inquiries did not constitute "interrogation" under *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). Pejsa challenges both findings.

■ Generally, the police must warn a person of his or her *Miranda* rights before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966); *State v. Baruso*, 72 Wn. App. 603, 609, 865 P.2d 512 (1993); *State v. Walton*, 67 Wn. App. 127, 129, 834 P.2d 624 (1992) (citing *State v. Sargent*, 111 Wn.2d 641, 647, 762 P.2d 1127 (1988)). The purpose of this requirement is to protect the individual from the potentiality of compulsion or coercion inherent in in-custody interrogation, and from deceptive practices of interrogation. *State v. Hensler*, 109 Wn.2d 357, 362, 745 P.2d 34 (1987). The requirement is not intended to unduly interfere with a proper system of law enforcement, or to hamper the traditional investigatory and public safety functions of the police. *Miranda*, 384 U.S. at 481; *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980).

■ A suspect is "in custody" for Fifth Amendment and *Miranda* purposes as soon as his or her freedom of action is curtailed to a "degree associated with formal arrest". *Berkemer v. McCarty*, 468 U.S. 420, 440, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983) (per curiam)); *State v. Watkins*, 53 Wn. App. 264, 274, 766 P.2d 484 (1989). The inquiry in this regard is how a reasonable

person in the suspect's position would have understood his or her situation. *Berkemer*, 468 U.S. at 442; *State v. Short*, 113 Wn.2d 35, 41, 775 P.2d 458 (1989); *State v. McWatters*, 63 Wn. App. 911, 915, 822 P.2d 787, *review denied*, 119 Wn.2d 1012 (1992).

■ "Interrogation" is defined in *Rhode Island v. Innis, supra*, as follows:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

(Footnotes omitted.) 446 U.S. at 301.

Only a handful of cases have considered whether police questioning of a "barricaded person" constitutes "custodial interrogation". In *Mesa*, the defendant barricaded himself in a motel room and made several incriminating statements to an FBI agent over the phone. To determine whether there had been a "custodial interrogation", the court examined the "precepts underlying the *Miranda* rule . . .". 638 F.2d at 584. The court noted that the *Miranda* Court had been presented with cases involving "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights". 638 F.2d at 585 (quoting *Miranda*, 384 U.S. at 445). The *Mesa* court noted that *Miranda* had been aimed at "in-custody" interrogations, because of

> the secrecy involved, the fact that the interrogator was alone with the suspect and thus could employ any number of subtle psychological pressures, and the fact that the suspect's will was much more likely to be worn down when he was interrogated while alone in an atmosphere controlled by the police. Therefore, the key aspect of the custodial setting as described in *Miranda* is the isolation of the suspect in a room that is dominated by the law enforcement officials who will interrogate him. In this setting, the police have immediate control over the suspect — they can restrain him and subject him to their questioning and apply whatever phychological techniques they think will be most effective.

638 F.2d at 585-86.

Ultimately, the *Mesa* court held that a situation involving a "barricaded person" did not involve the same concerns as were present in *Miranda*. A barricaded person can prevent "law enforcement officials from exercising immediate control over his actions". 638 F.2d at 586. A barricaded person can terminate his conversations with police simply by putting down the telephone. A barricaded person can control the direction of the conversation and is free to discuss anything he or she wants. 638 F.2d at 586. Thus, the *Mesa* court held that "by barricading himself in his motel room with a gun, [and] successfully prevent[ing] the FBI from exercising any control over his immediate actions or forcing him to be subjected to their questioning, [the defendant] was not in custody within the meaning of *Miranda*." 638 F.2d at 588.

Similarly, in *State v. Stearns*, 178 Wis. 2d 845, 506 N.W.2d 165 (Ct. App. 1993), an armed robbery suspect had barricaded himself in his apartment and then made various incriminating statements to police negotiators over the telephone. Relying on *Mesa*, the court held:

> Incriminating or not, the statements made by Stearns were not the product of a successful "incommunicado interrogation" in a police-dominated atmosphere in which the police actively sought to obtain Stearns' confession to the armed robbery. Rather, the statements were obtained while the police were trying to secure Stearns' nonviolent surrender. The situation did not involve the type of custodial setting aimed at securing a confession with which the *Miranda* Court was concerned.

> Moreover, extending *Miranda* to the situation presented here could have deleterious consequences on police efforts to avoid escalating a situation that might otherwise be resolved peacefully. . . .

> . . . .

> We conclude that Stearns' telephone statements do not implicate *Miranda*, because the purpose of the police detective's telephone conversation with Stearns was to secure his nonviolent surrender, not to induce him to confess or otherwise encourage him to incriminate himself. This is so even if custody and interrogation technically existed here under *Miranda*. The courts should not presume to impose *Miranda* requirements on the police in such supercharged situations where the constitutional concerns of *Miranda* are not present.

The police — not judges — are better equipped and trained to deal with such matters.

(Footnote omitted.) 178 Wis. 2d at 854; *see also State v. Reimann*, 19 Kan. App. 2d 431, 870 P.2d 1346 (1994) (questioning not "functional equivalent" of interrogation where police held at bay by defendant were trying to convince defendant not to shoot himself); *State v. Sands*, 145 Ariz. 269, 273, 700 P.2d 1369, 1373 (Ct. App. 1985) ("We cannot find that a man in his own home, possessing weapons, food, and supplies, with a vehicle at his disposal, a telephone, and resisting arrest can be said to be in custody.").

■ Finding *Mesa* and *Stearns* persuasive, we hold that there was no "custodial interrogation" here. Pejsa successfully had barricaded himself in the apartment in such a way as to prevent the police from exercising control over his actions. The police could not compel him to listen to their questions, much less subject him to the interviewing techniques or "tricks" that concerned the *Miranda* Court. He was free to hang up the phone whenever he was tired of talking, and he did so on a number of occasions. He was not in the type of police-dominated atmosphere that existed in *Miranda*, and the police were not required to give the *Miranda* rights.

## B

### RCW 9.73.030

Pejsa also argues the audiotape was made in violation of RCW 9.73.030. Generally, RCW 9.73 prohibits the recording of any "private communication" or "private conversation" without the consent of *all* parties involved in the communication. *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 184, 829 P.2d 1061 (1992); RCW 9.73.030(1)(a), (b). "Consent" is

obtained whenever one party has announced to all other parties engaged in the communication or conversation, in any reasonably effective manner, that such communication or conversation is about to be recorded or transmitted: PROVIDED,

That if the conversation is to be recorded that said announcement shall also be recorded.

RCW 9.73.030(3).

RCW 9.73.030(2)(d) states an exception to the need for consent by all parties to a conversation. It provides in pertinent part:

[W]ire communications or conversations . . . which relate to communications by a hostage holder or barricaded person as defined in RCW 70.85.100, . . . may be recorded with the consent of one party to the conversation.

A "barricaded person" is

one who establishes a perimeter around an area from which others are excluded and either:

(i) Is committing or is immediately fleeing from the commission of a violent felony; or

(ii) Is threatening or has immediately prior threatened a violent felony or suicide . . ..

RCW 70.85.100(2)(b).

Here, the police complied with RCW 9.73.030(3). On the tape itself, the following appears:

SWAT: . . . This is a closed line.
PEJSA: You're not recording it?
SWAT: I'm recording it.
PEJSA: Oh Okay.

Ex. 19, at 4-5. Thus, the police announced they were recording, and Pejsa acknowledged his understanding of that fact.

In any event, the police did not need Pejsa's consent because of RCW 9.73.030(2)(d), the"barricaded person" exception. Pejsa was within that exception because he had "established a perimeter around an area from which others are excluded", and because he had committed or was threatening to commit a violent felony. For these reasons, the trial court did not err in admitting the audiotape.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be

filed for public record pursuant to RCW 2.06.040, it is so ordered.

ALEXANDER and SEINFELD, JJ., concur.

Review denied at 125 Wn.2d 1015 (1995).