IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32683-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAY LENY BETANCOURTH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — A jury found Ray Betancourth guilty of second degree felony

murder and first degree assault. We reverse and remand for a new trial Betancourth's

conviction for second degree murder because the State, during closing argument,

misrepresented the elements of a defense available to Betancourth. We, nonetheless,

affirm a trial court ruling denying Betancourth's motion to suppress statements he made

during police station interviews.

## FACTS

Our statement of facts comes from both trial testimony and two motions to suppress evidence. We begin with some trial testimony on the charges of second degree murder and first degree assault against Ray Betancourth. On September 17, 2012, Betancourth noticed damage to windows of his Honda Civic. On September 19, on a basis unknown to us, Betancourth identified one of the window caperers as Terrence Frank.

During the afternoon of September 19, 2012, Ray Betancourth and his girlfriend texted one another:

> [Girlfriend:] Did you see the video Eiree posted on Facebook. Is
> that the black guy who broke your window.
> [Betancourth:] Yeah, I just—did.
> [Girlfriend:] Is that him?
> [Betancourth:] Yep. Both those fools.
> [Girlfriend:] Cool. Cool.
> [Betancourth:] Yep, I want to beat the shit of o' [sic] them.

Report of Proceedings (RP) at 1435 (internal quotation marks omitted).

In the early evening of September 19, Ray Betancourth assembled companions to harass Terrence Frank. Betancourth first summoned Marco Cardenas. He telephoned Mario Cervantes, while David Chavez was visiting Cervantes' house. Betancourth informed Chavez and Cervantes that he had located one of the men who broke his car windows and that he "wanted to beat his ass." RP at 905. Betancourth advised that he would shortly retrieve Chavez and Cervantes. Ten minutes later, Ray Betancourth,

2

driving a four-door Ford pickup truck, arrived at Cervantes' home with Marco Cardenas riding shotgun. Cervantes and Chavez entered into the backseat of the truck. The quartet journeyed through Toppenish and found Terrence Frank, with Jordan Lemus and Jose Rodriguez, walking on a sidewalk along the city's Madison Street.

Ray Betancourth stopped the pickup truck at a stop sign. David Chavez, from the backseat, then saw Marco Cardenas unfasten his seatbelt and move his hands. Chavez also heard Mario Cervantes tell Cardenas to "put that shit away." RP at 910. David Chavez did not see what object Cardenas placed in his hand because Chavez sat directly behind Cardenas. Nevertheless, Chavez noticed Marco Cardenas put away the object. Betancourth pulled a firearm from the truck door pocket, and placed it under his driver's seat. All four exited the truck.

The four companions planned for Ray Betancourth to fight Terrence Frank without anyone else scrapping. Betancourth hollered to the three walking on the sidewalk: "Who broke my windows?" RP at 917. Betancourth, Cervantes, Cardenas, and Chavez then chased the other three. Terrence Frank ran down the street, while Jordan Lemus and Jose Rodriguez ran into an alley south of Madison Street.

David Chavez testified that all four pursuers, with Marco Cardenas leading, followed Lemus and Rodriguez into the alley. Lemus jumped a fence, after which Marco Cardenas pulled a gun and shot twice. One or both bullets struck Rodriguez in the head. David Chavez testified that he did not know that Marco Cardenas carried a gun until the

3

shots fired.

According to Ray Betancourth, before Marco Cardenas fired the gun, Mario Cervantes yelled: "the truck." RP at 1220. Betancourth then ended his chase out of recognition that he left the pickup unattended and with the engine running. He returned to his truck to turn off the motor. As he opened the driver's door to the pickup, Betancourth heard "popping sounds." RP at 1221. According to Betancourth, he also did not know Marco Cardenas carried a gun. He did not expect Cardenas to shoot anyone.

According to David Chavez, Ray Betancourth, Marco Cardenas, Chavez, and Mario Cervantes quickly returned to Betancourth's Ford truck after the shooting and sped away. According to Ray Betancourth, once he entered his pickup truck and turned off the ignition, he noticed Marco Cardenas and David Chavez frantically sprinting to the pickup. Both hopped into the backseat of the truck. Betancourth then heard a thud and saw, through the rear view mirror, Mario Cervantes jumping into the truck's bed. Betancourth, not knowing what transpired, drove away.

David Chavez testified that Betancourth, Chavez, and Cervantes asked Cardenas, after the quartet returned to the pickup: "What the fuck, what—what are you doing?" RP at 944. Ray Betancourth testified he heard David Chavez twice loudly comment to Marco Cardenas: "You shot him." RP at 1223. Cardenas responded: "You think so." RP at 1224. Chavez also said to Marco Cardenas: "You fucked up." RP at 1226.

The foursome traveled out of Toppenish. David Chavez testified that Ray

4

Betancourth stopped the pickup truck on a Wapato bridge where Cardenas handed the gun to Betancourth, who threw it into the river. Betancourth denies stopping the truck on a bridge or handling a gun. Betancourth drove the truck to a friend's home in Buena. According to Betancourth, when the four arrived in Buena, the three others repeatedly questioned Marco Cardenas why he brought a gun to the fight.

At 6:20 p.m. on September 19, 2012, Toppenish Police Officer Casey Gillette traveled to the alley adjacent to Madison Street because of a report of gun shots and of a man stricken in the alley. Officer Gillette found a resident of a nearby house attending to an unconscious Jose Rodriguez. Officer Gillette summoned medical aid, which arrived and transported Rodriguez to the hospital. Fifteen-year-old Rodriguez died the following day.

Witnesses to the chase identified Ray Betancourth's Ford pickup truck as the vehicle used by Jose Rodriguez's assailants. Based on this identification, Toppenish police seized the truck on September 21.

The following portion of the statement of facts derives from a hearing to suppress statements uttered by Ray Betancourth. During the evening of September 21, 2012, Betancourth and his father entered the Toppenish police station. Toppenish Police Detective Jaban Brownell spoke to Betancourth's father about the seizure of the pickup truck, while Betancourth stood nearby. Eventually Detective Brownell asked Ray Betancourth to speak with him, Detective Damon Dunsmore, and Sergeant Paul Logan.

5

The police then considered Betancourth a suspect in the shooting death of Jose Rodriguez. Brownell did not mention to Betancourth any reason for requesting the interview. Betancourth offered no objection, and Detective Brownell led Betancourth to an investigations office at the back of the police station. Brownell told Betancourth that the interview was voluntary. Betancourth indicated he understood the voluntary nature of the interview, and Brownell further explained to Betancourth that he could leave at any time. Detective Brownell did not inform Betancourth that the latter was under arrest. Brownell did not place Betancourth in handcuffs.

Ray Betancourth's father asked to be present during the September 21 interview of his son, but Detective Jaban Brownell denied the request. Detective Brownell did not ask Betancourth if he wished his father present. Brownell and the other officers knew that Betancourth was eighteen years old at the time.

The Toppenish police investigations office was a converted, small single-wide trailer, approximately nine-feet wide by twenty-feet long, where three detectives worked at desks. Ray Betancourth sat in a chair near the trailer entry door. Detective Jaban Brownell, Detective Damon Dunsmore, and Sergeant Paul Logan questioned Betancourth for twenty to thirty minutes inside the trailer. Nobody recorded the questioning. The three officers asked Betancourth about his pickup truck's involvement in the shooting. One or more questions sought to elicit an admission from Betancourth as to his presence at the crime scene. Betancourth denied any involvement in a shooting. Betancourth left

6

the trailer after the officers finished asking questions.

We return to trial testimony. Sergeant Paul Logan followed Ray Betancourth to the Toppenish police station parking lot where he asked Betancourth to look at the latter's cell phone. Betancourth gave him permission, and Logan obtained Betancourth's cell phone number. On September 21, Detective Damon Dunsmore sent a preservation letter to Verizon Wireless to preserve records associated with Betancourth's phone number.

On September 25, 2012, the Yakima County District Court granted a search warrant ordering Cellco Partnership, dba Verizon Wireless, to provide Ray Betancourth's cell phone records from September 19 to September 25, 2012. Detective Damon Dunsmore faxed the warrant to Verizon's custodian of records in New Jersey, and Verizon sent the phone records to Dunsmore.

We return to testimony from the motion to suppress hearing. During the afternoon of October 9, 2012, Sergeant Paul Logan called Ray Betancourth and asked him to come to the Toppenish police station to answer more questions about the Ford pickup truck. Because he lacked a vehicle, Betancourth's mother drove him to the police station. Detective Damon Dunsmore took Betancourth to the detectives' trailer. Logan and Detective Jaban Brownell soon entered the trailer. During the interview, no officer told Betancourth that he was under arrest or that he could not leave the trailer. No officer delivered Betancourth the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 964 (1966). The interview lasted twenty to thirty minutes.

7

During the October 9 interview, the three Toppenish police officers presented incriminating evidence to Ray Betancourth. Detective Damon Dunsmore, Betancourth's former school resource officer, remained silent. Detective Jaban Brownell acted polite. Sergeant Paul Logan portrayed anger and hurled accusations at Betancourth. Betancourth testified that Logan's behavior intimidated and frightened him, particularly since Logan was a larger man than Betancourth. Once Logan grew hostile, Betancourth no longer deemed himself free to leave the trailer.

During the October 9 interview, Ray Betancourth initially denied his presence at the scene of the shooting of Jose Rodriguez. Detective Jaban Brownell testified at trial:

> So, I explained to Mr. Betancourth what . . . I had believed had occurred. And I explained . . . that the defendant was driving with another subject in this white truck, saw the victim and his two friends, returned to another location in Toppenish to elicit reinforcements, returned to this location to look for these three victims, and in the process of confronting them for a physical altercation one of them was shot. And then they left.
>
> So that was the information I was trying to elicit from him. An interview, an interrogation, call it what you will, I was trying to elicit some form of information from him.

RP at 1175.

Ray Betancourth again denied involvement in the crime. He portrayed confidence and occasionally flashed smirks. Detective Jaban Brownell showed Betancourth text messages from the latter's phone that police obtained from Verizon. Brownell played a three to four minute audio statement of Nancy Arriaga, Betancourth's girlfriend. Betancourth first denied that the voice on the recording was Arriaga's voice. As the

8

audio played further, his body language changed and Betancourth said: "Guess you know what happened then." RP at 1179.

Ray Betancourth asked to speak to an attorney, and the interview ended. Police arrested Betancourth the next day.

The Toppenish police department later learned that, under a recent court ruling, the district court search warrant for Ray Betancourth's cell phone records was invalid. A superior court search warrant was required to subpoena records in another state. On October 9, 2013, the Yakima County Superior Court granted, at Detective Jaban Brownell's request, a search warrant to obtain the same phone records procured from Verizon through the district court warrant. On October 15, Brownell sent the warrant by fax to the custodian of records in Verizon's legal compliance office in San Angelo, Texas, with a message that "THESE RECORDS WERE REQUESTED BY A DISTRICT COURT WARRANT PREVIOUSLY. BASED ON RECENT COURT RULING THEY NEED TO BE BASED ON A SUPERIOR COURT WARRANT." Clerk's Papers (CP) at 76. The warrant did not contain language required by RCW 10.96.020(2). Verizon never produced the records again.

PROCEDURE

The State of Washington charged Ray Betancourth with first degree assault and second degree felony murder for the assault and death of Jose Rodriguez.

Ray Betancourth moved to suppress the cell phone records and his statements to

9

the Toppenish police during the September 21 and October 9, 2012 interviews. During

the hearing to suppress the police station statements, Detective Jaban Brownell and Ray

Betancourth testified. The trial court denied the motion to suppress. The court reasoned

that no reasonable person would believe he was under arrest during either of the two

interviews. Regarding the October 9 interview, the court commented:

> Mr. Betancourth's recall of the events leading up to his conversation with officers on October 9 was relatively—sparse, didn't remember much about the circumstances; most of the detail he provided was of the actual conversation. Although he—it does not appear that he was told he was free to leave, at no point was he placed under arrest, he was never handcuffed, he was never told he couldn't leave.
> . . . .
> . . . There was nothing coercive about the interview with the exception of Mr. Betancourth's statements regarding Sgt. Logan, but even in his testimony, that is, Mr. Betancourth's testimony, there was no suggestion that Sgt. Logan stood up or displayed himself in an aggressive manner. He did indicate he was nervous, or afraid of him, but that was—based on what I saw from Mr. Betancourth I would not place significant credibility on that statement.

RP at 84-85. The trial court entered, in part, the following findings of fact and

conclusions of law after the motion to suppress hearing:

## I. FINDINGS OF FACT

1.1 During the investigation of the homicide which is the subject matter of this case, the Toppenish Police Department twice contacted the defendant and questioned him. The State now seeks to introduce evidence regarding the second of these two conversations. The first conversation took place on September 21, 2012.

1.2 On that date the defendant came to the Toppenish Police Department with his father. He had an approximately 20 to 30 minute conversation with officers at that time.

10

1.3  He was eighteen years of age.  He wanted to have his father present for the conversation but his father was not allowed to be present.

1.4  The defendant was not under arrest and was free to leave at any time.  He was never told he was under arrest.  Nor was he handcuffed or told he was not free to leave.

. . . .

1.6  On October 9, 2012 the defendant came to the Toppenish Police Department with his mother to talk about a truck which had been seized civilly.  The defendant was not under arrest and was free to leave.  He was never told he was under arrest, handcuffed, or told he was not free to leave.

1.7  Toppenish Police Department Detectives Jaban Brownell and Damon Dunsmore were present during this conversation, as was Sargent Paul Logan.  The defendant testified that he got along fine with Brownell and Dunsmore, but claims that he was nervous and felt intimidated by Logan.  The court does not find this claim credible.  As he testified the defendant presented as being very confident in a potentially stressful situation.

. . . .

1. 9  The defendant did actually terminate the October 9, 2012 contact so that he could consult with his attorney.  The officers did not impede or object to his doing so.

## II. CONCLUSIONS OF LAW

2.1 Miranda warnings were not required during either of September 21, 2012 or October 9, 2012 conversations which the Toppenish officers had with the defendant as no reasonable person in his position would believe that the[y] were under arrest on either occasion.

CP at 104-06.

The trial court later held a CrR 3.6 hearing on Ray Betancourth's motion to suppress his cell phone records because the district court warrant was not valid.  The court heard testimony from Detective Jaban Brownell, Detective Damon Dunsmore, and Melissa Sandoval, custodian of records for Verizon Wireless.  Sandoval testified that

11

Verizon still maintained the records of Betancourth's phone as requested in the preservation letter. She testified that Verizon could produce the records again if requested to do so. The trial court denied Betancourth's motion to suppress the phone records on the basis that the district court order was entitled to full faith and credit and producing the records again was fruitless.

The State of Washington's prosecution of Ray Betancourth proceeded to a jury trial. During trial, Betancourth raised the defense, to felony murder, available under RCW 9A.32.050(1)(b). The defense applies if Betancourth did not know Marco Cardenas was armed at the time of the chase of Jose Rodriguez.

During the State's case in chief, Detective Jaban Brownell testified to the two police interviews of Ray Betancourth. Brownell remarked that, during the September 21 interview, Betancourth provided different information from his father as to the use of the Ford pickup on the date of the shooting. In response, Betancourth declared his father to be lying. He denied any involvement in the shooting. Concerning the October 21 interview, Brownell testified to Betancourth's confidence until police played the audio recording of his girlfriend. Betancourth then changed his posture and remarked: "Guess you know what happened then." RP at 1179.

The State also raised the station-house statements when cross-examining Betancourth. Betancourth conceded he lied when he told the officers that he knew nothing about the shooting. During trial, the State showed the jury text messages from

12

Betancourth's phone records, including one message when Betancourth wrote: "'Yep. I wanna beat the shit of both of them.' Smiley face." RP at 1122. Ray Betancourth testified at trial that he did not know Marco Cardenas had a gun and, before the shooting, he returned to his truck to turn off the motor.

During closing argument, the State uttered the phrase, or a variation of the phrase: "beat the shit out of" twenty-three times. The State also reviewed the police station interviews, Betancourth's repeated denial of any involvement in the shooting, and his subsequent implied admission.

Also during closing arguments, the State argued concerning Ray Betancourth's defense:

> But there's another thing here. And that is that there's a statutory defense. And when I say that, you know that you've been told over and over—over again, the state has to prove the elements beyond a reasonable doubt. And the state has proved the elements beyond a reasonable doubt of felony murder.
> But what the law says is that, you know, this felony murder, it does cast a pretty broad net. Especially when you're talking about the conduct of other people. So there's an affirmative defense that he can bring, and if he can prove by a preponderance of the evidence, if he can prove, more likely than not, certain things—and we're going to look at another list of things—he has to prove all these things by a preponderance of the evidence, and if he does that, even though I proved the elements beyond a reasonable doubt then you would still have a duty to find him not guilty.
> So let's look at what the elements of that [defense] are.
> And I'm going to—He has to prove all four of these. I'm going to argue to you that he really doesn't prove any of them.
> Number one, he has to show he did not commit the homicidal act. That's true. But he—also has to show that he didn't solicit, request, importune—in other words provide the opportunity—or aid the commission of the homicidal act.

13

Well, he provided—importune means provide the opportunity. He provided the opportunity for the homicidal act, didn't he? He brought Marcos to the scene where the shooting took place. Rode around with him in a truck looking for Terrence and his friends. Went back and got reinforcements, took him back to the scene of the crime—

MR. THERRIEN [Betancourth's counsel]: Your Honor, I think that's a misstatement of the law. I think—he's talking about—he's referring to the second degree assault.

MR. SOUKUP [State's counsel]: I'm referring to this instruction right here, your Honor.

THE COURT: Objection's overruled.

MR. SOUKUP: So he gave him the opportunity, and he—and he aided it. It's—That's it right there. He can't show that by a preponderance of the evidence that he didn't do that. So you should deny it on that basis alone.

RP at 1450-51.

The trial court instructed the jury on second degree felony murder and first degree assault. The court also provided an instruction for a felony murder affirmative defense:

It is a defense to a charge of Murder in the Second Degree based upon committing the crime of second degree assault that the defendant:

(1) Did not commit the homicidal act or in any way solicit, request, command, [i]mportune, cause, or aid the commission thereof; and

(2) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(4) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty as to this charge.

14

CP at 170.

The jury found Ray Betancourth guilty of second degree murder and first degree

assault and imposed a firearm enhancement for each crime. The trial court sentenced

Betancourth, who lacked a criminal history, to 336 months confinement and imposed the

following financial obligations:

| RTN | $5,700.77 | Restitution distributed to: Crime Victims Compensation, subject to modification |
|-----|-----------|---------------------------------------------------------------|
| PCV | $500.00 | Crime Penalty Assessment- felony or gross misd. (RCW 7.68.035) |
| FRC | $200.00 | Criminal filing fee |
| PUB | $600.00 | Court appointed attorney recoupment (RCW 9.94A.760) |
| DNA | $100.00 | DNA collection fee (any felony committed after 7/1/02) (RCW 43.43.7541) |
| JFR | $250.00 | Jury fee |
| | $7,350.77 | TOTAL |

CP at 193 (boldface omitted). The trial court also found Betancourth financially able to

pay the costs of incarceration and medical care costs incurred by Yakima County and

ordered Betancourth to pay both.

## LAW AND ANALYSIS

### Prosecution Closing Argument

On appeal, Ray Betancourth contends the trial court erred by denying his motion

to suppress as evidence his statements during police interviews, by denying his motion to

suppress as evidence the cell phone text messages, by allowing the State to argue in

closing that he did not prove his defense to felony murder because of undisputed

15

evidence that he drove Marco Cardenas to the scene of the shooting, by allowing the

State during closing to repeatedly utter his text message of wanting to "beat the shit" out

of Terrence Frank, and by imposing the extent of the legal financial obligations. We

address first whether the trial court committed error by permitting the State's comments,

during closing argument, concerning the defense to felony murder.

Ray Betancourth raised the statutory defense to felony murder under RCW

9A.32.050. RCW 9A.32.050 creates the crime of second degree murder and reads, in

relevant part:

> (1) A person is guilty of murder in the second degree when:
> (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person; or
> (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.32.050(1)(b) denotes the crime of felony murder that occurs when the accused

does not shoot the victim, but an accomplice, during the commission of another crime,

shoots the victim.

In a prosecution for felony murder when a coparticipant, not the accused, shoots

the victim, the accused may raise a defense of lack of knowledge of the coparticpant

carrying a deadly weapon. The remainder of RCW 9A.32.050 reads:

16

. . . except that in any prosecution under this subdivision (1)(b) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:

(i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and

(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

We focus on RCW 9A.32.050(1)(b)(i), which subsection withdraws the defense if the accused solicited, requested, importuned, caused, or aided "the commission thereof." "Thereof" refers back to the "homicidal act," not the underlying felony. During closing arguments, the State argued that Ray Betancourth needed to prove that he did not "provide the opportunity" for the homicide. RP at 1451. The State declared: "Importune means provide the opportunity." RP at 1451. "He [Betancourth] provided the opportunity for the homicidal act, didn't he?" RP at 1451. "He brought Marcos to the scene where the shooting took place." RP at 1451. "So he gave him the opportunity." RP at 1451. "So you should deny it [the defense] on that basis alone." RP at 1451.

Contrary to the State's closing argument, the accused does not forfeit the defense under RCW 9A.32.050 by providing the gunman the opportunity to shoot. The word "opportunity" is not used in the statute. The State also erroneously declared that the word

17

"importune" means give one an opportunity. The Washington criminal code does not define the word "importune." We may use a dictionary to discern the plain meaning of an undefined statutory term. *Nissen v. Pierce County*, 183 Wn.2d 863, 881, 357 P.3d 45 (2015). "Importune" means in a lay dictionary:

> **1. a:** [T]o press or urge with frequent or unreasonable requests or troublesome persistence
> **2. b:** To make immoral or lewd advances toward

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1135 (1993). Thus, the State's summation conflicted with the law and with the court's instruction to the jury.

A prosecuting attorney commits misconduct by misstating the law. *State v. Allen*, 182 Wn.2d 364, 373-74, 341 P.3d 268 (2015); *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). Also, statements by the prosecution or defense to the jury on the law must be confined to the law as set forth in the instructions given by the court. *State v. Davenport*, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984); *State v. Estill*, 80 Wn.2d 196, 199, 492 P.2d 1037 (1972).

A case will be reversed for improper argument of law by counsel when the error is prejudicial to the accused. *State v. Davenport*, 100 Wn.2d at 762. In determining whether a trial was fair and whether the defendant suffered prejudice, the court should look to the trial irregularity and determine whether it may have influenced the jury. *State v. Davenport*, 100 Wn.2d at 762. The prosecuting attorney misstating the law of the case to the jury is a serious irregularity having the grave potential to mislead the jury. *State v.*

18

*Davenport*, 100 Wn.2d at 763. Misstating the law on a key issue in the case is a factor showing prejudice. *State v. Allen*, 182 Wn.2d at 375. The trial court's overruling, in the presence of the jury, of the defendant's objection to the misstatement of the law is an important factor in weighing prejudice since the trial court's ruling lends an aura of legitimacy to the improper argument. *State v. Allen*, 182 Wn.2d at 378.

We hold the State's closing argument was prejudicial to Ray Betancourth. Betancourth testified to his lack of knowledge of Marco Cardenas possessing a gun. One of the State's prime witnesses, David Chavez, also denied having knowledge of Cardenas bringing a gun to the chase. Other testimony supported a finding that Betancourth should have reasonably concluded that Cardenas held a gun during the chase, but the jury could have rejected this testimony and found otherwise. Although there was some evidence that Betancourth possessed a gun inside the pickup truck, Betancourth did not take his firearm on the chase. A jury could infer from this evidence that Betancourth did not want or expect anyone to bring a gun to the chase. The State's misstatement of the law was central to a key issue in the trial. The trial court impliedly approved the State's misinforming of the jury when the trial court overruled Betancourth's objections to the closing argument.

Because we reverse the conviction of Ray Betancourth on the basis of the prosecution's misstatement of the law, we do not address whether the prosecution engaged in misconduct when repeating, during closing, Betancourth's text message of

wanting to "beat the shit" out of Terrence Frank. We also decline to address the introduction as evidence of the Verizon records since any defect can be cured before a retrial. Finally, we need not address Betancourth's challenge to the imposition of legal financial obligations. Since a new trial is likely, we should and do determine whether the trial court should have granted Ray Betancourth's motion to suppress statements made during the two police station interviews.

Police Station Interviews

Ray Betancourth contends the trial court erred in admitting his statements to police during the September 21 and October 9, 2012 interviews. He argues the statements are inadmissible because he made them during custodial interrogations without the police affording him *Miranda* warnings. The State responds that the trial court properly admitted Betancourth's statements because he was not in police custody when the police interviewed him. Additionally, the State maintains that any error in admitting the statements was harmless. We agree with the State that Betancourth was not in custody at the time of the interviews.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Article 1, section 9 of the Washington State Constitution declares, in part: "No person shall be compelled in any criminal case to give evidence against himself. . . ." Article 1, section 9 is equivalent to the United States Constitution's Fifth Amendment

20

and should receive the same interpretation. *State v. Templeton*, 148 Wn.2d 193, 207-08, 59 P.3d 632 (2002); *State v. Foster*, 91 Wn.2d 466, 473, 589 P.2d 789 (1979).

The right against testimonial compulsion is not limited to the courtroom. In *Miranda v. Arizona*, 384 U.S. at 467 (1966), the United States Supreme Court adopted prophylactic measures designed to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. The *Miranda* Court held that a suspect interrogated while in police custody must be told that he has a right to remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney, either retained or appointed, at the interrogation. *Miranda v. Arizona*, 384 U.S. at 444; *Maryland v. Shatzer*, 559 U.S. 98, 104, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010). Without *Miranda* warnings, a suspect's statements during custodial interrogation are presumed involuntary and are thus inadmissible. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004).

The United States Supreme Court formulated *Miranda* warnings to protect a defendant's constitutional right not to make incriminating confessions or admissions to police while in the coercive environment of police custody. *Miranda v. Arizona*, 384 U.S. at 468-69 (1966); *State v. Heritage*, 152 Wn.2d at 214. Washington courts have enunciated two rationales for recognizing a custodial situation requiring *Miranda* warnings: (1) to protect the individual from the potentiality of compulsion or coercion inherent in in-custody interrogation, and (2) to protect the individual from deceptive

21

practices of the interrogation. *Heinemann v. Whitman County*, 105 Wn.2d 796, 806, 718 P.2d 789 (1986). Conversely, the requirement is not intended to unduly interfere with a proper system of law enforcement or to hamper the traditional investigatory and public safety functions of the police. *Miranda v. Arizona*, 384 U.S. at 481.

Law enforcement officers need not deliver the *Miranda* warnings whenever speaking with a citizen, let alone questioning a prime suspect of a crime. For statements to be later admissible, *Miranda* warnings must precede the statements made during (1) custodial (2) interrogation (3) by an agent of the State. *State v. Heritage*, 152 Wn.2d at 214.

The State concedes that its agents conducted the questioning of Ray Betancourth. The State also presents no argument on whether the police questioning constituted interrogation. "Interrogation" can be express questioning or any words or actions reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 292, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 685, 327 P.3d 660 (2014). In both police station encounters, officers directly questioned Ray Betancourth about his involvement in a murder. Detective Jaban Brownell testified, at a suppression hearing, that he sought to elicit from Betancourth information about the murder. We conclude that Toppenish law enforcement officers interrogated Betancourth. The issue becomes whether the trial court correctly ruled that Betancourth was not "in custody" during the station interviews.

The United States Supreme Court declared, in *Miranda v. Arizona*, that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444 (1966). The police are required to give *Miranda* warnings only when "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. at 495.

The United States Supreme Court has given some guidance as to factors that, standing alone, do not merit a finding of custody. "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Oregon v. Mathiason*, 429 U.S. at 495. Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system that may ultimately cause the suspect to be charged with a crime. *Oregon v. Mathiason*, 429 U.S. at 495. There is coercion and there is coercion. A small

23

degree of coercion is permissible. A large degree of coercion is not permissible. Lower courts must adjudge the dividing line between the two.

Similarly *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. at 495. The high court has rejected the notion that the "in custody" requirement is satisfied merely because the police interviewed a person who was the "focus" of a criminal investigation. *Beckwith v. United States*, 425 U.S. 341, 347, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976).

A key aspect of the custodial setting as described in *Miranda* is the isolation of the suspect in a room that is dominated by law enforcement officials. *State v. Pejsa*, 75 Wn. App. 139, 147, 876 P.2d 963 (1994). Whether officers told the suspect he was free to leave is also a significant factor in the custody analysis. *State v. D.R.*, 84 Wn. App. 832, 838, 930 P.2d 350 (1997). A court may consider age in the custody analysis so long as the suspect's age was known to the officer at the time of police questioning or would have been objectively apparent to a reasonable officer. *J.D.B. v. North Carolina*, 564 U.S. 261, 274, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011).

The test of whether police engage in a custodial interrogation is an objective test. *J.D.B. v. North Carolina*, 564 U.S. at 270. We do not consider whether the accused subjectively considered himself restrained or free to depart the presence of law enforcement or whether the officers considered the accused free to leave or under implied

arrest. Instead we consider the mythical reasonable person and hope that judges can discern what a reasonable person would think.

A person is in custody, for purposes of *Miranda* warnings, when "a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." *State v. Heritage*, 152 Wn.2d at 218 (2004). It thus is irrelevant whether the police had probable cause to arrest the defendant, whether the defendant was a "focus" of the police investigation, whether the officer subjectively believed the suspect was or was not in custody, or even whether the defendant was or was not psychologically intimidated. *State v. D.R.*, 84 Wn. App. at 836 (1997). The critical inquiry is not the psychological state of the defendant but whether his freedom of movement is restricted. *State v. Sargent*, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988). The circumstances of each case must influence a determination of whether a suspect is "in custody" for purposes of receiving of *Miranda* protection. *California v. Beheler*, 463 U.S. at 1125 (1983).

Ray Betancourth argues that both encounters in the Toppenish detectives' trailer satisfied the custodial prong of the *Miranda* analysis because a reasonable person of similar age would not have felt free to leave. The State argues the trial court decided correctly because he was never told that he could not leave, the officers never threatened him, and he voluntarily went to the police station and talked to the police. We consider the elements emphasized by the State to be critical and agree with the State's position.

25

The facts of some United States Supreme Court and Washington appellate court decisions assist us. In *Oregon v. Mathiason*, 429 U.S. 492 (1977), the Supreme Court held that the defendant was not in custody when questioned about his involvement by a detective at an office in the state patrol station. The suspect willingly went to the station to discuss the burglary, met the officer in the hallway, shook hands, and went into an office. The officer told the suspect he was not under arrest. The two sat across a desk with the door closed when the officer began questioning the suspect about his involvement in the burglary. Within five minutes of entering the office, the suspect confessed and then received his *Miranda* warnings. The Supreme Court found he was not subject to custodial interrogation because "there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way." *Oregon v. Mathiason*, 429 U.S. at 495.

In *California v. Beheler*, 463 U.S. 1121 (1983), Jerry Beheler admitted his involvement in a fatal shooting. He was at the police station when he made the incriminating statements. Although he was not given his *Miranda* warnings, the police told Beheler that he was not under arrest. The Supreme Court reversed the California Court of Appeals, holding that *Miranda* warnings were not required.

In *State v. Furman*, 122 Wn.2d 440, 858 P.2d 1092 (1993), law enforcement took Michael Furman's confession to murder without reading him *Miranda* warnings. Furman was seventeen years old at the time. The Supreme Court refused to suppress the

26

confession because Furman was free to leave during the confession.

In *State v. Grogan*, 147 Wn. App. 511, 195 P.3d 1017 (2008), *review granted*, 168 Wn.2d 1039, 234 P.3d 169 (2010), Clifford Grogan voluntarily went to the Spokane Public Safety Building to talk to officers about a murder investigation. He was not placed under formal arrest. He was told that he could leave at any time and he acknowledged that he was told he could leave at any time. The interviewing detectives did not give *Miranda* warnings. This court affirmed the trial court's refusal to suppress the statements given during the interview.

Ray Betancourth suggests his case is similar to *State v. Daniels*, 160 Wn.2d 256, 156 P.3d 905 (2007). In *Daniels*, the police suspected the defendant committed homicide by abuse for the death of her nine-week-old son. The day after her son's funeral, two police detectives questioned seventeen-year-old Carissa Daniels for over 90 minutes in an 8 foot by 10 foot room at the precinct. The detectives refused to allow her father to accompany her. They did not give her any *Miranda* warnings until near the end of the interrogation, she refused to answer any more questions soon after receiving the warnings, and then they placed her in a holding cell. Our Supreme Court found the detectives subjected Daniels to a custodial interrogation and affirmed suppression of her statements. Unfortunately, the decision provides little insight into what factors are important or controlling when determining the status of custody.

We deem other decisions more analogous than *State v. Daniels*. In *Daniels*, the

27

record shows no comments to the accused that she was not under arrest or that she could leave at any time. The interrogation took place the day after the son's funeral, while Carissa Daniels suffered stress. Ray Betancourth suffered no similar stress. Daniels was seventeen years old, while Betancourth was eighteen years of age. Although the difference in age is only one year, we consider an eighteen-year-old to be the age of majority and capable of living on one's own. Although both interviewing rooms were small, the Toppenish trailer was double the size of the precinct room in *Daniels*. Betancourth understood he was free to leave, and he left on his own volition both times.

Ray Betancourth emphasizes his age. Ray Betancourth was eighteen at the time of the killing and the police station questioning. In *J.D.B. v. North Carolina*, 564 U.S. at 272, the United States Supreme Court held that the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda v. Arizona*. The court reasoned that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave. The Supreme Court did not announce, however, the dividing line between an adult and a child. The petitioner, J.D.B., was thirteen years old when he was removed from his classroom by a uniformed police officer, escorted to a closed-door conference room, and questioned by two police officers with two school administrators present and encouraging him to speak. Even then, the Supreme Court did not suppress the confession, but remanded the case for the lower court to consider age as one factor in the determination of whether J.D.B. was in custody.

28

Toppenish police officers' denial of entry of Ray Betancourth's parents into the investigations office plays in favor of Betancourth. Nevertheless, we do not find this factor controlling. The *Daniels* court considered this factor, but did not rule it controlling. We find no case in which a court holds that the barring of a parent from the interview should require police to give a child *Miranda* warnings. Although not directly on point, the following decisions hold that a child's statement without a parent present constituted a voluntary statement. *State v. Moore*, 2015 WI 54, 363 Wis. 2d 376, 864 N.W.2d 827; *People v. Edwards*, 2015 IL App (3d) 130190, 32 N.E.3d 116, 392 Ill. Dec 116, *leave to appeal filed*, No. 119332 (Ill. 2015); *State v. Moses*, 390 S.C. 502, 702 S.E.2d 395 (Ct. App. 2010); *Smith v. State*, 276 Ga. 97, 575 S.E.2d 450 (2003).

The record does not show that law enforcement told Ray Betancourth, during the October 9 interview, that he was free to leave. Nevertheless, Jaban Brownell told Betancourth such during the September 21 questioning and there was little difference between the two interviews. The September 21 and October 9 interviews shared location, participants, and duration. No officer told Betancourth he was under arrest during the second interview. Betancourth left when he wanted.

Ray Betancourth did not incriminate himself during the first interview. One might even question if Ray Betancourth seriously incriminated himself at the end of the second interview. During the October 9 interrogation, the law enforcement officers played a tape recording of Betancourth's girlfriend confessing to the crime on behalf of Betancourth.

29

The jury heard the same recording during the trial. During the second interview, Betancourth merely uttered the obvious: "Guess you know what happened then." RP at 1179.

Ray Betancourth assigns error to many of the trial court's findings of fact, but most of alleged errors concern findings addressing whether Betancourth was in custody during the law enforcement interviews. Two discrete inquiries are essential to the determination of custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). Once the trial court reconstructs the play and determines the stage props, the actors' positions and movements on stage, and the elocution and dialogue of the actors, the reviewing court applies an objective test to resolve the ultimate inquiry of whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Regardless of whether the status of being in custody is referred to as a finding of fact or a conclusion of law, we review the determination de novo because of its legal significance. *Thompson v. Keohane*, 516 U.S. at 121; *State v. Daniels*, 160 Wn.2d at 261 (2007). Still, we agree with the trial court's determination of the lack of custody.

Ray Betancourth assigns error to finding of fact 1.7, which reads:

    . . . The defendant testified that he got along fine with [Detectives]
    Brownell and Dunsmore, but claims that he was nervous and felt
    intimidated by [Sergeant] Logan. The court does not find this claim
    credible. As he testified the defendant presented as being very confident in
    a potentially stressful situation.

CP at 105. This finding is one of pure fact unencumbered by legal consequences. If the accused challenges findings of fact, they are verities if supported by substantial evidence in the record. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. *State v. Cherry*, 191 Wn. App. 456, 464, 362 P.3d 313 (2015). Substantial evidence supports the trial court's finding of fact 17.

### State Motion to Consolidate

The State moves to consolidate this appeal with Ray Betancourth's appeal No. 33954-8-III. In that appeal, Betancourth challenges the trial court's denial of his motion for a new trial. The State argues that consolidation may aid our review by providing additional insights and evidence from the trial court. We deny the motion to consolidate.

### CONCLUSION

We reverse the conviction of Ray Betancourth for second degree murder and remand to the trial court for a new trial on the charge. We deny Betancourth's request to preclude use of his statements uttered during his two police station interviews.

31

No. 32683-7-III
*State v. Betancourth*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____          _____
Siddoway, J.                                             Pennell, J.