[Cite as *State v. Campbell*, 2019-Ohio-5004.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-17-1289

        Appellee                                 Trial Court No. CR0201603375

v.

Terry Campbell                                   **DECISION AND JUDGMENT**

        Appellant                                Decided: December 6, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Terry Campbell, appeals the judgment of the Lucas County Court of Common Pleas, convicting him of one count of aggravated murder under R.C. 2903.01(A), with a firearm specification, and sentencing him to life in prison without the possibility of parole. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} This matter arises from the December 16, 2016 death of appellant's wife, C.C. On that day, Toledo police responded to C.C.'s home at 247 Mayberry in Lucas County, Ohio. When the police arrived, appellant barricaded himself upstairs with the couple's infant child. The S.W.A.T. team subsequently stormed the residence, finding C.C. dead in the kitchen from multiple gunshot wounds. After a lengthy standoff, appellant surrendered peacefully.

{¶ 3} On December 29, 2016, the Lucas County Grand Jury returned a four-count indictment against appellant, charging him with one count of aggravated murder based upon prior calculation and design under R.C. 2903.01(A), one count of aggravated murder for purposely killing another during the commission of an aggravated burglary under R.C. 2903.01(B), one count of murder, and one count of aggravated burglary. On June 1, 2017, appellant withdrew his initial plea of not guilty, and entered a plea of guilty to one count of aggravated murder. However, a few days later, appellant moved to withdraw his guilty plea, which the trial court granted.

{¶ 4} Thereafter, appellant filed a motion to suppress any and all evidence unlawfully seized from C.C.'s home. In particular, appellant sought the suppression of his wallet and the contents thereof, which included a note that constituted evidence of appellant's motive and state of mind regarding the murder of his wife. Appellant argued that the evidence should be suppressed because the search warrant lacked sufficient particularity when it described as items to be seized, "any/all other unnamed evidence

2.

related to the death of [C.C.]." In addition, appellant also moved to suppress statements that he made to the police at the scene while he was barricaded upstairs. Appellant argued that those statements were the product of a custodial interrogation. After a hearing, the trial court denied appellant's motions.

{¶ 5} The matter then proceeded to a four-day jury trial beginning on October 30, 2017. At the trial, the prosecution played the 911 call from C.C., during which she can be heard pleading for help and explaining that her husband was chasing her with a gun. She can then be heard begging with appellant for him to leave, and hysterically screaming "no," and "please, no." The phone then disconnects.

{¶ 6} The victim's father, J.C., testified next. He testified that after the crime scene had been cleared, he was responsible for cleaning the house. He stated that he observed multiple bullet holes in the kitchen, and that he spent about half an hour cleaning up his daughter's blood. J.C. also testified that the basement of the house was decorated in a Cleveland Browns theme because appellant was a fan of that football team. However, despite it being football season, the television and speakers had all been unhooked, and similarly, the television and speakers upstairs had been disconnected and packed up.

{¶ 7} The state next called Toledo Police Officer Nathaniel Morrison. Morrison testified that on December 16, 2016, the 911 call came in at 1:02 a.m., and that he and his partner responded to the scene by 1:05 a.m. Morrison stated that when they arrived, they stopped a couple of houses down from 247 Mayberry. As Morrison approached the

3.

house on foot, he heard a series of three to four gunshots, followed by a short pause of a couple seconds, then a single gunshot. Upon hearing the gunshots, Morrison took a defensive position. Approximately 20 seconds after the final gunshot, appellant emerged from the residence in a tank top and blue boxer shorts. Morrison observed appellant run towards a car in the street with something in his hand. Once appellant noticed the police officers, he ran back towards the house. Appellant did not comply with the officers' commands to stop, but as he was running back towards the house he yelled several times to the officers to come with him and "come help her." Morrison testified that another officer approached the door to the house but was unable to gain entry. At that point, the officers surrounded the house, and Morrison testified that no one entered or exited the residence until the S.W.A.T. team went in later in the night.

{¶ 8} The next witness to testify was Mark Johnson, who was assigned to the video unit of the Toledo Police Department. Johnson authenticated a video recording taken from appellant's security cameras, which was then played for the jury. The recording showed appellant arriving at the residence at approximately 12:43 a.m., fully clothed and with a winter coat and hat. In the video, appellant approaches the door and picks up a box that is on the porch. He then uses his keys to open the screen door and front door. After opening the screen door, appellant sets the box on a chair next to the door, and the box tips over. Appellant then opens the inside door, and retrieves the box from the chair, taking the time to pick up the item that had fallen out of it. Appellant then enters the residence. The whole process took approximately one minute.

4.

{¶ 9} The state then called Toledo Police Officer Jamie Brown. Brown was on patrol on December 16, 2016, and responded to 247 Mayberry. Brown testified that as he arrived and was speaking to an officer on the scene, appellant ran out of the house. Appellant then saw the officers and ran back towards the house, yelling "help her." Brown followed appellant to the house, but when he tried to enter the house, the door was locked. Brown then proceeded to the rear of the house, where he heard items being pushed up against the back door in an effort to blockade it. Brown testified that after appellant entered the house, no one else entered or exited until the S.W.A.T. team went in.

{¶ 10} Sergeant William Shaner testified next. Shaner was the sergeant in charge of the S.W.A.T. team that responded to the scene. Shaner testified that prior to entry, he deployed a throw phone—essentially a phone inside of a box mounted with cameras and a microphone—to establish communication with appellant and to be able to hear and see what was going on inside of the residence. Through the throw phone, Shaner could hear an adult male yelling and an infant crying. Shaner also deployed two small robots—each approximately one foot long by six inches wide and weighing less than five pounds—to gather visual information on what was occurring inside the house. The second robot was placed in the kitchen window, and was driven off of the kitchen counter, landing on C.C. Shaner testified that from the images transmitted by the robot, he could see C.C.'s legs, knees, and feet, and that she was unresponsive.

5.

{¶ 11} The decision was then made to enter the residence. After securing the first floor and checking on C.C., the S.W.A.T. team approached the stairs to the second floor where they believed appellant was located. Shaner testified that as they reached the stairs, appellant threw a water bottle down as a warning not to try and come up the stairs. Shaner stopped and identified himself and asked appellant to come down with his hands up. Appellant responded, "Don't come up here, don't come up here, I'll shoot."

{¶ 12} Shaner then engaged in a dialogue with appellant. Through the course of several hours, Shaner attempted to calm appellant down and humanize the situation. As they were speaking, Shaner conveyed that he knew how things could happen when people are going through a divorce, and how two people can start in a fight and then one thing leads to another. Shaner testified that he told appellant, "I know how these things can happen and, you know, I'm sure you didn't plan for this to happen." According to Shaner, appellant then replied in a very defeated tone, "Well, Bill, I did. I did, Bill." Eventually, appellant came downstairs and surrendered himself.

{¶ 13} Following Shaner's testimony, the state called Toledo Police Detective Jeffrey Jackson of the Scientific Investigation Unit. Jackson was the individual who documented the crime scene. Jackson took photographs of and collected a firearm located on the sidewalk leading up to the house, as well as a firearm located in an upstairs bedroom. Jackson also photographed and collected eleven bullet casings and several bullets. Photos of the crime scene were admitted as evidence, including photos of C.C. Through Jackson, the state also admitted a photograph of appellant's driver's license and

6.

pay stub, which were located in his wallet, and which listed appellant's address as 824 Delence Street. On cross-examination, Jackson identified a picture that he took of mail addressed to appellant at 247 Mayberry. Jackson also acknowledged that appellant's driver's license was issued in February 2015, and was unexpired at the time of the incident.

{¶ 14} The state next called forensic scientist Devonie Herdeman as an expert witness. Herdeman testified that both appellant and C.C. were included in the DNA profiles found on the two firearms.

{¶ 15} The next witness to testify was Lucas County Deputy Coroner Dr. Cynthia Beiser. Dr. Beiser testified that the victim had suffered eight different gunshot wounds. She further testified to a degree of medical certainty that the victim died from those multiple gunshot wounds within a matter of minutes. Finally, Dr. Beiser testified that the lining of the victim's uterus was hemorrhagic, which is consistent with an abortion procedure.

{¶ 16} Detective James Dec of the Toledo Police Computer Crimes Unit testified next. Dec authenticated two videos that were taken from appellant's cell phone, which were then played for the jury. In the videos, appellant accused C.C. of having an abortion, claiming that she became pregnant while cheating on appellant and she was unsure of who the father was. Dec also downloaded the text message history from appellant's cell phone, and identified one message sent at 6:54 a.m. on December 16, 2016, in which appellant stated "Hey i killed [C.C.] im sorry."

7.

{¶ 17} The final witness to testify was Toledo Police Detective William Goodlet, who was the investigating detective on this case. Through Goodlet, the state introduced by stipulation the BCI report that showed that the bullet casings were fired from the guns found at the scene. Goodlet also read to the jury a note that was found in appellant's wallet at the scene. The note, which was handwritten in cursive, was critical of C.C., and described how C.C. took her newborn son out with her in the early morning hours of December 13, 2016, so that she could have sex. When appellant returned home from work at 6:10 a.m., C.C. then left the house to sneak to Michigan to have an abortion. The note claimed that C.C. had busted his head, scratched his truck, broken everything that he had owned, spit in his face, and then went on Facebook and lied about appellant to make him look bad and her look good. The note concluded, "I probably could get over anything in the World but you don't kill my kid & if it wasn't my kid to began with that was her fault cuz we're married. You can't fuck over Everybody & smile." Then, in all capital, printed letters, the note stated, "LESSON SELFISH GREEDY BITCH YOU KILT THE WRONG KID."

{¶ 18} Goodlet then testified regarding appellant's cell phone messages to C.C. Goodlet testified that in the weeks before C.C. was killed, appellant did not appear to be very happy with her, and was calling her lots of derogatory names. Goodlet also testified that from the messages, it did not appear that appellant was living with C.C. in December 2016. Goodlet explained that the messages indicated that appellant was looking for homes, and that he did not want to live with his mother anymore. Further, there were text

8.

messages from the end of November from C.C. to appellant telling him that he was not welcome at her house anymore, and that she wanted him out of there. Goodlet also testified that appellant was aware that C.C. was pregnant by the end of November 2016. Then, on December 13, 2016, between noon and 1:00 p.m., appellant sent a string of text messages to C.C. stating over and over that he hoped she died during the abortion.

{¶ 19} Finally, Goodlet testified that two days later, on December 15, 2016, the day before C.C. was killed, appellant attempted to contact her 31 times. In those messages, appellant told C.C. that he loved her, that he was sorry, and that he wanted to work on their marriage. C.C. did not respond to any of the messages or phone calls.

{¶ 20} Following the state's presentation of its evidence, appellant moved for an acquittal on all charges pursuant to Crim.R. 29. The trial court denied appellant's motion. Appellant then rested without presenting any evidence. After the trial court instructed the jury and the parties made their closing arguments, the jury retired to deliberate. The next day, the jury returned with a verdict of guilty as to all counts. Sentencing was held the following day, on November 3, 2017, at which the trial court merged the first count of aggravated murder with the remaining three counts, and sentenced appellant to life in prison without the possibility of parole, to run consecutively to the mandatory three-year prison sentence for the firearm specification.

## II. Assignments of Error

{¶ 21} Appellant has timely appealed his judgment of conviction, and now assigns nine errors for our review:

1. The trial court erred in denying the defendant's motion to suppress evidence gathered pursuant to an overly broad warrant in violation of the defendant's rights pursuant to Fourth and Fifteenth Amendments to the United States Constitution and Article I, Section Fourteen of the Ohio Constitution.

2. The trial court erred in denying the defendant's motion to suppress statements of the appellant in violation of his Fifth Amendment constitutional rights and the basic holdings in *Miranda v. Arizona*.

3. The appellant's convictions were not supported by a sufficiency of evidence.

4. Appellant's convictions are against the manifest weight of the evidence.

5. The trial court erred in failing to grant appellant's Rule 29 motion to dismiss at the time of trial.

6. The court committed plain error and abused its discretion in permitting jury instructions of aggravated burglary and trespass.

7. The appellant was denied effective assistance of counsel, further denying him the right to due process, equal protection under the law and the right to a fair trial as guaranteed by the U.S. Constitution and the Fifth Amendment, Sixth Amendment, Eighth Amendment, Ninth Amendment

10.

and Fourteenth Amendment and those guaranteed under the Ohio Constitution.

8. The cumulative effect of the errors committed by the trial court violated the defendant's right to a fair trial and his constitutional rights to due process, the right to confront evidence and the right to be free from arbitrary, cruel and unusual punishment in contradiction to the U.S. Constitution, Amendments V, VI, VII, IX and XIV and the privileges granted in the Ohio Constitution.

9. The trial court erred in imposing the maximum sentence in violation of the Eighth Amendment to the United States Constitution and the guidelines under the Ohio Revised Code 2953.08 and by basing the reasoning of the maximum sentence upon inappropriate and prejudicial factors.

### III. Analysis

### A. Motion to Suppress

{¶ 22} In his first and second assignments of error, appellant challenges the trial court's decision not to suppress the note found in his wallet or his statements to Sergeant Shaner during the stand-off, respectively.

### 1. Standard of Review

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court

assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. (Internal citations omitted.)

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

## 2. Search Warrant Particularity

{¶ 23} In his first assignment of error, appellant argues that the trial court erred in denying his motion to suppress the note found in his wallet because the warrant did not describe the evidence to be seized with sufficient particularity.

{¶ 24} The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Likewise, Article I, Section 14 of the Ohio Constitution is nearly identical in its language, "and its protections are coextensive with its federal counterpart." *State v. Kinney*, 83 Ohio St.3d 85, 87, 698 N.E.2d 49 (1998). "The manifest purpose of this particularity requirement was to prevent general searches. * * * [T]he requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of

the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987).

{¶ 25} "Courts addressing the particularity requirement of the Fourth Amendment are concerned with two issues. The first issue is whether the warrant provides sufficient information to 'guide and control' the judgment of the executing officer in what to seize. * * * The second issue is whether the category as specified is too broad in that it includes items that should not be seized." (Internal citations omitted.) *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 79. "A search warrant that includes broad categories of items to be seized may nevertheless be valid when the description is 'as specific as the circumstances and the nature of the activity under investigation permit.'" *Id.* at ¶ 80, quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir.1985). "Warrants that fail to describe the items to be seized with as much specificity as the government's knowledge and the circumstances allow are 'invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.'" *Id.*, quoting *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir.1987).

{¶ 26} In this case, the warrant described the property to be searched for and seized as: "handguns (unknown caliber) and ammunition to match the handguns, handgun parts, clothing, surveillance video recording equipment, cellular telephones, computers and other electronic devices and any/all other unnamed evidence related to the death of [C.C.]."

13.

{¶ 27} Appellant argues that the phrase "any/all other unnamed evidence related to the death of [C.C.]" is overly broad. In support, he cites *Castagnola* and *State v. Gritten*, 11th Dist. Portage No. 2004-P-0066, 2005-Ohio-2082, both of which we find distinguishable. In *Castagnola*, the Ohio Supreme Court held that a search warrant that listed property to be seized as "[r]ecords and documents either stored on computers, ledgers, or any other electronic recording device," without containing any description or qualifiers limiting what the searcher was permitted to look for, was overly broad and failed to satisfy the particularity requirement. *Castagnola* at ¶ 82. Similarly, the Eleventh District in *Gritten* held that a search warrant was overly broad where it described the items to be seized as "any evidence of the crime drug abuse and all other fruits and instrumentalities of the crime at the present time unknown." *Gritten* at ¶ 14. The Eleventh District reasoned that "drug abuse" is not a particular crime under the Revised Code. *Id.* Further, the court noted that it "fail[ed] to see any reason why the warrant could not have described the items to be seized more precisely." *Id.* at ¶ 15.

{¶ 28} In contrast, in *State v. McCrory*, 6th Dist. Wood Nos. WD-09-074, WD-09-090, 2011-Ohio-546, ¶ 43 this court noted that "[s]ubject-matter limitations sufficient to satisfy the particularity requirement include references to the crime or criminal activity at hand, specific persons, or specific types of material." Thus, we concluded that a search warrant was sufficiently particular where it authorized a search for

14.

Computers, emails, photos, flash drives, external hard drives, cell

phones, any documents with information from Craigslist.org. Any names

or addresses or phone number for persons that replied to the advertisement

posted on Craigslist.org, any digital media able to store or house emails and

photos. Any billing or billing statements from Craigslist.org, any banking

withdrawal slip showing cash advances on or about 6/21-22/2008. Any and

all contraband.

Which is in violation of

Rape 2907.02 ORC

*Id.* at ¶ 6-8, 44-45. *See also State v. Bangera*, 2016-Ohio-4596, 70 N.E.3d 75, ¶ 51 (11th

Dist.) (warrant containing long list of generic items was not overly broad because the

warrant "expressly qualified each item to be seized as being connected with drug

trafficking"); *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31, 13-13-32, 2014-Ohio-

557, ¶ 34 (warrant was sufficiently specific where it indicated items to be searched and

seized that may have yielded evidence of drug possession or drug trafficking).

{¶ 29} Here, the phrase "any/all unnamed evidence related to the death of [C.C.]"

was preceded by a list of items, all of which were expressly tied to the specific crimes of,

inter alia, aggravated murder, murder, and voluntary manslaughter. Thus, this search

warrant did not authorize a wide-ranging, exploratory search for evidence of any crime.

Rather, consistent with *McCrory*, we find this description to be sufficiently particular to

guide and control the executing officer in what to seize, and that the description of the

evidence sought was as specific as the circumstances and the nature of the activity under investigation permitted. Therefore, we find no merit to appellant's argument that the search warrant lacked particularity.

{¶ 30} Accordingly, appellant's first assignment of error is not well-taken.

### 3. Custodial Interrogation

{¶ 31} In his second assignment of error, appellant argues that his statements to Sergeant Shaner should have been suppressed because they were made during the course of a custodial interrogation and without appellant having received the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 32} The issue in this case centers on whether appellant was subjected to "custodial interrogation." Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444.

{¶ 33} "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" (Internal quotation omitted.) *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Here, appellant argues that he was in the functional equivalent of custody when he was

16.

barricaded upstairs in the residence, in that he was not free to leave due to the presence of the armed S.W.A.T. team surrounding his location. We disagree.

{¶ 34} Although not a frequent occurrence, courts that have dealt with this issue have uniformly held that a defendant is not "in custody" during a hostage situation or police stand-off. *State v. Christopher*, 8th Dist. Cuyahoga No. 54331, 1988 WL 128260 (Dec. 1, 1988), presents a representative fact pattern. In that case, police responded to the scene of a reported gunshot wound. When they arrived, they observed a body lying on the front porch, and a distraught man who was heavily armed and threatening suicide. The police retreated to safety and were able to engage the defendant in numerous telephone conversations. The defendant secured himself inside of the house, and held 45 police officers at bay for approximately four hours. *Id.* at *1, 7. At trial, the court allowed the police officers to testify to the statements that appellant made during those four hours, despite the fact that no *Miranda* warnings had been given. On appeal, the Eighth District affirmed, reasoning that the defendant was not in custody at the time the statements were made, and thus *Miranda* did not apply. *Id.* at *7.

{¶ 35} Other courts have provided a more robust explanation of the reasoning: "an officer who is talking to a suspect under these conditions is not physically in the suspect's presence and thus lacks immediate control over the suspect, who retains a degree of freedom of action inconsistent with a formal arrest; indeed the suspect can readily terminate communications at any time by hanging up the phone." *People v. Mayfield*, 928 P.2d 485, 521 (Cal.1997), *abrogated on other grounds*, *People v. Scott*,

349 P.3d 1028 (Cal.2015). *See also People v. Scott*, 269 A.D.2d 96, 98, (N.Y.App.2000); *United States v. Mesa*, 638 F.2d 582, 588 (3d. Cir.1980); *State v. Pejsa*, 876 P.2d 963, 969 (Wash.App.1994).

{¶ 36} Here, in the same way, the S.W.A.T. team was not in the physical presence of appellant and lacked immediate control over his person, and appellant retained a degree of freedom of action in the upstairs part of the residence that was inconsistent with a formal arrest. Therefore, we hold that appellant was not in custody for purposes of *Miranda*.

{¶ 37} Furthermore, we hold that appellant was not subject to interrogation. "'[I]nterrogation' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *State v. Tucker*, 81 Ohio St.3d 431, 436, 692 N.E.2d 171 (1998), quoting *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "[T]o determine whether a suspect has been 'interrogated,' the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak by that coercion." *Id.* "This compulsion can be brought about by express questioning, but also can be brought about by the 'functional equivalent' of express questioning, *i.e.*, 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.*, quoting *Innis* at 300-301.

{¶ 38} In this case, the incriminating statements were not the product of a successful "incommunicado interrogation of [an individual] in a police-dominated atmosphere" about which *Miranda* was concerned. *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602, 16 L.Ed.2d 694. Rather, the statements were obtained while Sergeant Shaner was trying to secure appellant's nonviolent surrender. *See State v. Stearns*, 506 N.W.2d 165, 168 (Wis.App.1993); *State v. Reimann*, 870 P.2d 1346, 1350 (Kan.App.1994); *State v. Pejsa*, 876 P.2d 963, 969 (Wash.App.1994). Indeed, instead of seeking a confession, Shaner was attempting to minimize appellant's criminal conduct when he stated to appellant that "I know how these things can happen and, you know, I'm sure you didn't plan for this to happen." Therefore, we hold that Shaner's interaction with appellant was not an interrogation, and thus *Miranda* does not apply.

{¶ 39} Accordingly, appellant's second assignment of error is not well-taken.

## B. Sufficiency of the Evidence

{¶ 40} In his third assignment of error, appellant argues that his conviction for aggravated murder was based upon insufficient evidence. In his fifth assignment of error, appellant argues that the trial court erred in denying his Crim.R. 29 motion for acquittal. Because a Crim.R. 29 motion for acquittal is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence, we will address the assignments of error together. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

19.

{¶ 41} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 42} Appellant was found guilty of aggravated murder under both R.C. 2903.01(A) and 2903.01(B). R.C. 2903.01(A) provides, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." In contrast, R.C. 2903.01(B) states, in relevant part, "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit * * * aggravated burglary."

{¶ 43} Relative to his conviction under R.C. 2903.01(A), appellant argues that the state produced insufficient evidence to establish that the murder was committed with "prior calculation and design." "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. Three factors are traditionally considered in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to

20.

choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Id.* at ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997).

{¶ 44} Appellant contends that although he and C.C. clearly knew each other, and their relationship was strained, there is no evidence that appellant gave thought to selecting a murder weapon or choosing the murder site. To the contrary, appellant asserts that if he had given thought or preparation to choosing the time and place of the murder, he would not have been dressed solely in his underwear, would not have left surveillance cameras running, and would not have selected a time when their child was present in the house. Appellant also points to the manner in which he entered the residence—that he entered the front door using a key, was unhurried, and even stopped to pick up a box and its contents—as evidence that he did not enter the home planning to murder C.C., but rather that her death was the result of a spontaneous eruption due to rising emotions between the two parties.

{¶ 45} However, the evidence in this case includes the barrage of text messages sent to C.C. three days before she was killed in which appellant repeatedly stated that he hoped she died during the abortion procedure. The evidence also includes the note found in his wallet, which read "I probably could get over anything in the World but you don't kill my kid & if it wasn't my kid to began with that was her fault cuz we're married. You can't fuck over Everybody & smile." Then, in all capital, printed letters, the note stated, "LESSON SELFISH GREEDY BITCH YOU KILT THE WRONG KID." Both the text

21.

messages and the note lead to the reasonable inference that appellant contemplated C.C.'s death.

{¶ 46} Moreover, the manner in which appellant killed C.C. supports a conclusion of prior calculation and design. "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001). Evidence of prior calculation and design includes facts which demonstrate that appellant's conduct "went beyond a momentary impulse and show that he was determined to complete a specific course of action." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46. Here, the evidence from the 911 call was that appellant was chasing C.C. throughout the house with guns. The forensic evidence revealed that appellant then shot at C.C. at least 11 times with two different guns, and struck her eight times. Bullet casings and bullets were found in several different rooms throughout the house. In addition, Officer Morrison testified that within minutes of the 911 call being placed, he heard a series of shots, followed by a brief pause, and then a single shot. We find that all of this evidence supports the conclusion that appellant did not act on a momentary impulse, but that he developed a plan to kill C.C. and was determined to complete that plan.

{¶ 47} Finally, according to Sergeant Shaner, appellant admitted in his own words that he meant to kill C.C. When Shaner said to appellant, "I know how these things can happen and, you know, I'm sure you didn't plan for this to happen," appellant replied, "Well, Bill, I did. I did, Bill."

22.

{¶ 48} Therefore, we hold that appellant's conviction for aggravated murder based upon prior calculation and design under R.C. 2903.01(A) is supported by sufficient evidence.

{¶ 49} Turning to the finding of guilt under R.C. 2903.01(B), appellant argues that the state failed to prove that he purposely caused the death of another while committing an aggravated burglary. R.C. 2911.11(A) defines the offense of aggravated burglary as,

> No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

The offense of "trespass," in turn, is defined as "No person, without privilege to do so, shall do any of the following: (1) Knowingly enter or remain on the land or premises of another." R.C. 2911.21(A)(1).

{¶ 50} Appellant contends that there was no evidence that he used force, stealth, or deception to enter the residence, or that he was trespassing in the residence. In support of his position, appellant argues that he used his key to enter the front door, and there was no court order prohibiting him from being in his marital home. Further, appellant notes

that the residence contained his clothing and other possessions, and there was mail addressed in his name at that address. Separately, appellant argues that there is no evidence that he trespassed with the purpose to commit a criminal offense. We disagree.

{¶ 51} The evidence in the record demonstrates that the residence was titled solely in C.C.'s name, and although appellant had lived there as his marital residence, the text messages introduced at trial reveal that C.C. asked appellant to move out, and appellant did, in fact, move out. That appellant did not reside at the home is also borne out by the fact that his television equipment was unhooked and packed up. In addition, even if appellant entered the home with C.C.'s permission, his privilege to be there terminated when he started threatening her and chasing her with guns. In *State v. Steffen*, 31 Ohio St.3d 111, 115, 509 N.E.2d 383 (1987), the Ohio Supreme Court held that a jury was justified in inferring that the defendant's privilege to be in the victim's parent's home "terminated the moment he commenced his assault on her." Similarly, here, C.C. can be heard on the 911 call begging appellant to leave while he is chasing her. Thus, any privilege appellant had to be at the residence ended, and his remaining on the property constituted a trespass. Therefore, we hold that the state presented sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that appellant purposely caused the death of another while committing an aggravated burglary.

{¶ 52} Accordingly, appellant's third and fifth assignments of error are not well-taken.

24.

## C.  Manifest Weight of the Evidence

{¶ 53} In his fourth assignment of error, appellant argues that his conviction is against the manifest weight of the evidence.  When reviewing a manifest weight claim,

> [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

State v. Lang, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting State v. Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 54} In support of his assignment of error, appellant relies on his argument that his conviction was based on insufficient evidence.  Upon our review of the entire record, we find that this is not the exceptional case in which the evidence weighs heavily against the conviction.  Here, although an inference could be made that this crime occurred as a spontaneous eruption based upon the evidence that appellant calmly entered the residence, was in his underwear at the time the crime occurred, and killed C.C. while their child was in the home, we find that the weight of the evidence is such that the jury did not clearly lose its way when it found that appellant acted with prior calculation and design.  In particular, the text messages expressing his desire that she die, his handwritten

note angrily stating that she killed the wrong kid, his conduct of chasing C.C. throughout the house and shooting her eight times, and the admission to Sergeant Shaner that he meant to kill C.C. all support appellant's conviction for aggravated murder.

{¶ 55} Likewise, regarding the second count of aggravated murder, while an inference could be made that appellant was not committing an aggravated burglary when he killed C.C., we hold that the weight of the evidence supports the jury's finding that appellant forcefully trespassed on the property with the purpose to commit a criminal offense, and that while doing so appellant purposely killed the victim. The evidence demonstrates that the victim asked the appellant to move out of the residence, and appellant did move out. Further, any permission that appellant had to be at the residence was revoked when appellant began chasing her and threatening her with guns.

{¶ 56} Therefore, we hold that appellant's conviction for aggravated murder is not against the manifest weight of the evidence.

{¶ 57} Accordingly, appellant's fourth assignment of error is not well-taken.

### D. Jury Instructions on Aggravated Burglary and Trespass

{¶ 58} In his sixth assignment of error, appellant argues that the trial court erred when it overruled appellant's objections to the proposed jury instructions on aggravated burglary and trespass. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240.

26.

{¶ 59} In this case, appellant does not contend that the jury instructions were incorrect statements of the law, but rather that the instructions should not have been given because they were not warranted by the facts. In support, appellant reiterates his argument that he entered the residence with his key, the residence contained his clothing, mail, and other possessions, and there was no court order denying his access. We disagree for the same reasons discussed in appellant's third, fourth, and fifth assignments of error: the victim had asked appellant to move out of the home, text messages from appellant showed that he did move out of the home, appellant's possessions were packed up, and any permission he had to be in the home was revoked when he began chasing the victim and threatening her with guns. Therefore, we hold that the trial court did not err in instructing the jury on aggravated burglary and trespass.

{¶ 60} Accordingly, appellant's sixth assignment of error is not well-taken.

### E. Ineffective Assistance of Counsel

{¶ 61} In his seventh assignment of error, appellant claims that his trial counsel was ineffective, thus depriving him of a fair trial. To prevail on a claim of ineffective assistance of counsel, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 694. In undertaking our review, we note that "[j]udicial scrutiny of counsel's performance must be highly

27.

deferential. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

{¶ 62} In support, appellant first argues that counsel was ineffective for failing to negotiate a better plea agreement, and for failing to warn him that what he said during pretrial proceedings could be used at sentencing. Prior to appellant's decision to replace his trial counsel, appellant's original counsel was able to negotiate an agreement whereby appellant would plead guilty to aggravated murder based upon prior calculation and design, and the remaining charges and gun specifications would be dismissed. In addition, the state agreed not to make a sentencing recommendation, although it did reserve the right to highlight several of the facts at the sentencing hearing. No better deal was offered. While taking the plea, the trial court informed appellant that if it determined that the appropriate sentence was life without the possibility of parole, it would allow appellant to withdraw his guilty plea and proceed to trial. Appellant initially agreed to the proposed deal and pleaded guilty. Several days later though, before the sentencing hearing was held, appellant moved to dismiss his counsel and withdraw his guilty plea, which the trial court ultimately allowed him to do.

{¶ 63} Appellant now summarily argues that counsel could have negotiated a better deal. However, appellant makes no effort to demonstrate why he could have gotten a better deal or whether the state would have agreed to a different plea deal. Thus, we hold that appellant has failed to demonstrate that counsel's performance was deficient.

28.

**{¶ 64}** Next, appellant asserts that counsel was ineffective for failing to warn him that anything he said during pretrial proceedings could be used at sentencing. By way of background, at sentencing the trial court referred to comments that appellant made during the June 20, 2017 hearing on the motion to withdraw his guilty plea. Specifically, at the June 20, 2017 hearing appellant offered his theory that the robot introduced into the residence by police during the stand-off weighed one hundred pounds, and that it was actually the robot falling on C.C. that caused her death. Appellant asserted that C.C. was still alive in the kitchen at that time and was speaking to him. During the sentencing hearing, the trial court referred to those comments as "offensive." Returning to appellant's claim of ineffective assistance, the record reveals that, despite appellant's assertions to the contrary, trial counsel did warn him not to make those comments. Counsel stated at the hearing on the motion to withdraw:

> So on a number of occasions, as with regard to this issue of whether the robot was the causal factor in his wife's death, I am quite certain that we did advise him that going down this road with a defense that had no basis in science or logic, could result -- not would, but could result in him facing life in prison without parole, which is in fact what he faced in this matter.

Thus, we hold that appellant has not demonstrated that counsel's performance fell below an objective standard of reasonableness.

{¶ 65} Appellant also asserts that counsel was ineffective for failing to examine whether physical evidence could be suppressed. Again, the record belies appellant's claim. Appellant cites counsel's statement,

> In light of all this evidence, the coroner's report, ballistics, DNA, statements, physical evidence, text messages, Facebook, all of these things we examined with an eye toward, could we suppress them or could this be a motion in limine? * * * We never really discussed those with Mr. Campbell because we headed down a path of resolution.

However, three sentences later, appellant's trial counsel stated, "So rather than get into specifics, I will just indicate that all of those subjects were touched on and that we covered them and I think in appropriate fashion, ultimately coming to the conclusion that there were no meaningful motions that could be filed." Thus, counsel clearly examined whether those items could be suppressed. Moreover, appellant has failed to demonstrate that any of the items should have been suppressed. Indeed, as discussed above, the trial court properly denied appellant's motion to suppress that was filed by replacement counsel. Thus, we hold that appellant has failed to demonstrate that counsel's performance was deficient or that it was prejudicial.

{¶ 66} Finally, appellant argues that replacement trial counsel was ineffective for failing to object to "any number of exhibits (dozens) offered by the State." Appellant then lists 20-30 page numbers from the transcript of the trial where exhibits were admitted. Appellant describes these exhibits as "rang[ing] from recordings, photographs,

30.

cell phone records and printouts, clothing, reports, and expert reports." Appellant makes no effort, however, to explain why any of these exhibits should not have been admitted, except to generically claim that counsel could have raised "objections concerning Improper Foundation, Lack of Proper Authentication of Records, Hearsay, Improper use of Business Records, Materiality, Relevance, and others." Without specific objections to specific pieces of evidence, we cannot say that appellant has satisfied his burden to demonstrate that counsel's performance was deficient or prejudicial.

{¶ 67} In light of the foregoing, we hold that appellant has not satisfied his burden under *Strickland* to demonstrate ineffective assistance of counsel.

{¶ 68} Accordingly, appellant's seventh assignment of error is not well-taken.

### F. Cumulative Error

{¶ 69} In his eighth assignment of error, appellant argues that his convictions must be reversed due to cumulative error. Pursuant to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Here, however, we have not found multiple instances of harmless error, thus the cumulative error doctrine does not apply. *Id.*

{¶ 70} Accordingly, appellant's eighth assignment of error is not well-taken.

31.

## G. Sentencing

{¶ 71} Finally, as his ninth assignment of error, appellant argues that the trial court abused its discretion when it imposed the maximum sentence of life in prison without the possibility of parole. Appellant acknowledges that his sentence is within the range of sentences provided by statute, but he contends that his sentence does not comply with the principles and factors of R.C. 2929.11 and 2929.12.

{¶ 72} As noted by the state, however, appellant's sentence for aggravated murder is not reviewable. "[T]here is no constitutional right to an appellate review of a criminal sentence." *State v. Smith*, 80 Ohio St.3d 89, 97, 684 N.E.2d 668 (1997), relying on *Estelle v. Dorrough*, 420 U.S. 534, 536, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975). Article IV, Section 3(B)(2) of the Ohio Constitution provides that "Courts of appeals shall have such jurisdiction *as may be provided by law* to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district." (Emphasis added.) That law is R.C. 2953.08, which "specifically and comprehensively defines the parameters and standards—including the standard of review—for felony-sentencing appeals." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21. Relevant here, R.C. 2953.08(D)(3) provides "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." As recognized by the Ohio Supreme Court, "R.C. 2953.08(D) is unambiguous. [That provision] clearly

means what it says: such a sentence cannot be reviewed." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 17.

{¶ 73} Moreover, even if we could review appellant's sentence for an abuse of discretion as he argues, we find no merit to his argument. Appellant contends that the trial court was improperly influenced by the stand-off that occurred before appellant surrendered, and by the statements appellant made regarding his theory of the robot causing the C.C.'s death. In imposing its sentence, the trial court dutifully referenced the principles and purposes of sentencing provided in R.C. 2929.11, as well as the seriousness and recidivism factors found in R.C. 2929.12. The court then found that although appellant did not have a serious criminal history, he did have a "hint of a streak of violence." The court also remarked that appellant's offered explanation that this was a crime of passion arising from C.C.'s decision to have an abortion, and his proposed theory that the robot caused her death, were not supported by the evidence. Instead, the court found that the evidence demonstrated that appellant was really motivated by his ego and pride, and he could not accept the fact that C.C. no longer wanted him in her life. The court then recounted that appellant chased C.C. throughout the house, and recalled the sense of terror that he heard from C.C. on the 911 call. The court detailed that appellant stalked her throughout the house, shooting at her eleven times until she was cornered in the kitchen. Finally, the court concluded that appellant shot C.C. eight times, "[c]learly just meant to inflict as much pain as possible on this young woman." Upon

33.

this record, we cannot conclude that the trial court's decision to sentence appellant to life in prison without the possibility of parole was an abuse of discretion.

{¶ 74} Accordingly, appellant's ninth assignment of error is not well-taken.

## IV. Conclusion

{¶ 75} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Christine E. Mayle, P.J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.